UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PALMER HOLDINGS and INVESTMENTS, INC. d/b/a PALMER'S DELIS AND MARKETS, BREADWORKS and SUNSET GOLD<br><br>Plaintiffs,<br><br>v.<br><br>INTEGRITY INSURANCE COMPANY and INEGRITY PROPERTY & CASUALTY INSURANCE COMPANY,<br><br>Defendants. | Case No. 4:20-cv-00154-CRW-CFB<br><br><br><br>**FIRST AMENDED AND SUBSTITUTED COMPLAINT AND JURY DEMAND** |

COME NOW the Plaintiffs, and for their First Amended and Substituted Complaint and Jury Demand state as follows:

**PARTIES AND JURISDICTION**

1. This Petition is for a civil action in which Plaintiffs seek to recover damages for breach of contract and bad faith caused by Defendants' denial of a business interruption insurance claim, and further seek declaratory relief regarding the coverage provided under Plaintiffs' insurance policy.

2. Plaintiff Palmer Holdings and Investments, Inc., is an Iowa corporation whose principal place of business is Polk County, Iowa.

3. Palmer Holdings and Investments, Inc. owns, operates and manages various food and beverage restaurants primarily located in Polk County, including Palmer's Delis and Markets, Breadworks and Sunset Gold.

4. Upon information and belief, Integrity Insurance Company and Integrity Property & Casualty Insurance Company are authorized to sell property casualty insurance in Iowa.

5. That both Defendants are listed as being licensed in Iowa and have the same address at P. O. Box 539, 2121 East Capitol Drive, Appleton, WI 54911.

6. The insurance policy at issue was purchased and primarily to be enforced and interpreted in Polk County, Iowa.

7. The damages giving rise to this Petition are sufficient to meet the jurisdictional requirements for the amount in controversy.

8. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C 1332(a)(1).

9. Venue is conferred pursuant to 28 U.S.C. 1391.

## FACTUAL BACKGROUND

10. To protect its businesses in the event they suddenly had to suspend operations for reasons outside of their control, Plaintiffs purchased Businessesowners' Coverage that included both Business Income and Civil authority insurance coverage from Illinois Casualty Company.

11. In return for the payment of premiums, Defendants individually or collectively caused to be issued a business interruption and loss of income policy to the Plaintiffs on October 1, 2019, policy number BP2767901 01.

12. The policy is an "all-risk" policy which covers all risks of loss except for those risks that are expressly and specifically excluded.

13. The policy in question was a blanket business personal property coverage form providing for coverage that would pay for "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

14. The Businessowner's' Coverage Form, Form No. BP 00 03 01 10, includes coverage for Business Income and Civil Authority.

15. Defendant's Businessowners'' Coverage Form is a form policy drafted by the Insurance Services Office, Inc. ("ISO").

16. The provisions and exclusions are not the product of discussions or negotiations between Defendant and the Plaintiffs. Rather, the exclusions in the all-risk policy consist of

standardized language and terms that have been developed by the insurance industry through its trade association, the ISO, and are used industry and nationwide.

17. The Business Income provision in the Policies requires Defendant to "pay for the actual loss of business income sustained due to the necessary suspension of operations during the 'period of restoration.' The suspension must be caused by direct physical loss of or damage to the property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss."

18. The policies also provide "Extra Expense" coverage, which promises to pay the expense incurred to minimize the suspension of business and to continue operations.

19. In addition, the Policies provide separate "Civil Authority" coverage, which promises to pay for actual loss of Business Income and necessary Extra Expense caused by the action of a civil authority that prohibits access to the described premises.

20. The policies do not define the phrase "direct physical loss of or damage to….", nor do they define "direct", "physical", "loss", or "damage" individually.

21. The use of the disjunctive "or" in the phrase "direct physical loss of or damage to" means that coverage is triggered if either a physical loss of property **or** damage to property occurs.

22. The Policies' use of the disjunctive "or" between the terms "physical loss" and "damage" necessarily means that either a "loss" or "damage" is required, and that "loss" is distinct from "damage."

23. The Policies do not state or otherwise define "loss" to require an actual alteration of property.

24. At the time Plaintiffs purchased the Policies, courts had held on numerous occasions that any condition making it impossible to use property for its intended use constituted "physical loss or damage to property."

## **COVID-19**

25. In December 2019, an outbreak of illness known as Covid-19 caused by a novel coronavirus formally known as SARS-CoV-2 was first identified in Whuan, Hebei Province, China.

26. In an event that has not occurred in more than a century, a pandemic of global proportions then ensued, with the virus quickly spreading to Europe and then to the United States.

27. From the first reported case in the United States in January 2020 to the present, the impact of the virus and the resulting disease has been staggering on life and property.

28. On February 26, 2020, the Centers for Disease Control and Prevention (the "CDC") warned that community transmission of the disease existed in the United States. The virus was spreading with no ability to trace the origins of new infections.[1]

29. Moreover, the nature of the virus has made its containment particularly challenging. Numerous scientific studies and articles have concluded the virus spreads when droplets from an infected person land on objects and surfaces and then, after contacting the infected objects and surfaces, other individuals touch their eyes, noses, or mouths.

30. Per the CDC and World Health Organization (the "WHO"), a person may become infected by: (1) coming into close contact (about 6 feet) with a person who has COVID-19; (2) absorbing respiratory droplets when an infected person talks, sneezes, or coughs; or (3) touching surfaces or objects that have the virus on them and then touching his or her mouth, eyes, or nose.[2]

---

[1] CDC Confirms Possible Instance of Community Spread of COVID-19 in U.S., Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2020/s0226-Covid-19-spread.html (last visited August 15, 2020).

[2] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited August 15, 2020).

31. Besides being deadly, the virus is challenging to contain because infected individuals can be asymptomatic-and thus unaware that they might be spreading the virus through the mere touching of objects and surfaces.

32. Studies have estimated that more than 40% of infected individuals may never develop any symptoms.[3]

33. Even individuals who appear healthy and present no identifiable symptoms of the disease will still spread the virus by merely breathing, speaking, or touching objects and surfaces.

34. Though droplets carrying the virus are not visible, they are nonetheless physical objects that attach to and cause harm to property.

35. Unlike many other viruses that are unable to survive for long periods of time outside the body, the novel coronavirus is resilient and can survive on surfaces for days and even weeks.[4]

36. On March 11, 2020, the World Health Organization declared Covid-19 a pandemic.[5]

37. On March 13, 2020, the federal government declared a national emergency. Three days later, the CDC and members of the national Coronavirus Task Force issued public guidance, styled as "30 Days to Slow the Spread," that advocated for the first time far-reaching social-distancing measures, such as working from home; avoiding shopping trips and gatherings of more than 10 people; and staying away from bars, restaurants, and food courts.

---

[3] Erika Edwards, Asymptomatic COVID-19 Cases May Be More Common Than Suspected, NBC News (May 27, 2020, 12:43 PM), https://www.nbcnews.com/health/health-news/asymptomatic-covid19-cases-may-be-more-common-suspected-n1215481 (last visited August 15, 2020).

[4] Public Health Responses to COVID-19 Outbreaks on Cruise Ships-Worldwide, February-March 2020, Centers for Disease Control and Prevention, https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited August 15, 2020).

[5] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline/#! (last accessed on August 15, 2020).

## PLAINTIFFS' CLAIMS FOR INSURANCE BENEFITS

38. On March 17, 2020, Iowa Governor Kim Reynolds issued a proclamation closing all bars and restaurants from dine-in or in-person service.

39. The proclamation did not mandate the closing of or impact other stores and businesses, such as grocery stores, gas stations, and golf courses. Other businesses that provided service to Plaintiffs were, however, closed.

40. The action of this Civil Authority resulted in the necessary suspension of Plaintiffs' operations as they economically could not operate their businesses solely on a take-out or delivery basis.

41. The proclamation caused "direct physical loss of or damage to" Plaintiffs' covered property under the Policy by precluding Plaintiffs from conducting their operations, precluding customers from patronizing the business, and otherwise frustrating the intended purposed of Plaintiffs' businesses, all thereby causing the necessary suspension of operations during a period of restoration.

42. Governor Reynolds' March 17, 2020 Order prohibited access to Plaintiff's Covered Property, and the area immediately surrounding the Covered Property, in response to dangerous physical conditions resulting in and from a Covered Cause of Loss.

43. Losses caused by COVID-19 and/or the Governor Reynolds' proclamation triggered the Business Income, Extra Expense, and Civil Authority provisions of the Policy.

44. As a result of Governor Reynolds' Proclamation, Plaintiffs have been forced to terminate approximately 117 employees who were employed by the insured facilities.

45. Plaintiffs, in an effort to mitigate their income losses, have attempted to provide curb service, take-out services, or deliveries at three of the insured facilities that have not proven to be financially sustainable.

46. Plaintiffs collectively have incurred a loss of net income in excess of $50,000 per month and will continue to incur loss of that amount until such time as they are able to completely and fully open.

47. Palmer Holdings and Investments, Inc., and all insureds under policy BP-2767901 01, with the assistance of Plaintiffs' insurance broker, Holmes Murphy & Associates of Waukee, Iowa, submitted a claim for a loss as a result of the Governor of the State of Iowa issuing an Order closing restaurants and food and beverage businesses throughout the State of Iowa.

48. Plaintiffs have fully complied with their obligations under the policy.

49. On April 8, 2020 Palmer Holdings and Investments, Inc. received a letter from Integrity Insurance Company stating that Integrity had completed their investigation and have determined that there would be no coverage under the applicable policy for the claim. The denial-of-coverage letter is attached hereto and made a part of the allegations of the Petition.

50. The purported reason for the denial of coverage as set forth in the declination letter is the policy's exclusion of loss due to a virus, and because there was no "direct physical damage" to property.

51. No one behalf of Defendants in any manner investigated any of the insured facilities to determine whether the corona virus or any other virus was present in any of the insured facilities.

52. Plaintiffs have no knowledge of any of the insured facilities being infected with the corona virus or any other virus, nor are they aware of any employee or customer having contracted the corona virus or any other virus at any of the facilities at any time.

53. That Plaintiffs paid premiums of $18,185.00 for business loss policy.

### **THE VIRUS EXCLUSION**

54. Defendant's denial of Plaintiffs' claims relied in part on an exclusion contained in the Policies regard "Loss Due to Virus or Bacteria" (the "Virus Exclusion").

55. In 2006, the two major insurance industry trade groups, Insurance Services Office, Inc. ("ISO") and the American Association of Insurance Services ("AAIS") represented hundreds of insurers in a national effort so seek approval from state insurance regulators for the adoption of the Virus Exclusion.

56. In their filings with the various state regulators, on behalf of insurers, ISO and AAIS represented that the adoption of the Virus Exclusion was only meant to "clarify" that coverage for "disease-causing agents" has never been in effect and was never intended to be included in property policies.

57. In its "ISO Circular" dated July 6, 2006 entitled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria", ISO represented to state regulatory bodies that: "While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent." https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf (last accessed August 16, 2020)

58. Similarly, AAIS, in its "Filing Memorandum" in support of the Virus Exclusion, represented: "Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease-causing agents. With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended….This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded."

https://www.uphelp.org/sites/default/files/attachments/aais_virus_or_bacteria_filing_memo_ap.pdf (last accessed August 16, 2020).

59. The foregoing representations made by the insurance industry justifying the inclusion of the Virus Exclusion were false.

60. By 2006, the time of the state applications to approve the Virus Exclusion, courts had repeatedly found that property insurance policies covered claims involving disease-causing agents.

61. In securing approval for the adoption of the Virus Exclusion by misrepresenting to the state regulators that the Virus Exclusion would not change the scope of coverage, but rather just clarify existing coverage, the insurance industry effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged.

62. Based on information and belief, Defendant directly or indirectly participated in the insurance industry's efforts to effect state Insurance Commissioners, including the State of Iowa's Insurance Commissioner, to approve the suggested virus exclusion.

63. Defendant incorporated suggested provisions of the Insurance Services Office, Inc. into the policy issued to Plaintiffs, including the definition of covered losses, Civil Authority, and virus exclusions.

**COUNT I**
**DECLARATORY JUDGMENT AGAINST INTEGRITY INSURANCE COMPANY and INTEGRITY PROPERTY & CASUALTY INSURANCE COMPANY PURSUANT TO IOWA RULES OF CIVIL PROCEDURE 1.1101/FEDERAL RULES OF CIVIL PROCEDURE 56 AND 57**

64. Plaintiffs re-allege all of the above paragraphs 1 through 63 as if fully set forth herein.

65. Plaintiffs claim damages that are covered under the business interruption and loss of income policy issued by the Defendants, including claims under the Business Income, Extra Expense, and Civil Authority provisions.

66. Defendants have denied coverage under policy BP 2767901 01.

67. An actual justiciable controversy exists between the Plaintiffs and Defendants with regard to whether the loss claimed by Plaintiffs is covered under the policy that has been issued to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in its favor and against the Defendants, including the relief of:

a. Entering a Declaratory Judgment acknowledging the rights of the Plaintiffs and obligation of the Defendants under the policy and declaring that the loss claimed by the Plaintiffs is covered under policy BP 2767901 01;

b. Estopping Defendant from reliance on the Virus Exclusion in support of its denial of coverage based on the false and misleading pretense in which the Virus Exclusion was allowed to be included in the Policies; and

c. Ordering payment of loss of income as substantiated by the Plaintiffs, and for such other and further relief as the Court deems proper, including costs and attorney fees.

## COUNT II
## BREACH OF CONTRACT

68. That Plaintiffs re-allege paragraphs 1 through 67 as fully set forth herein.

69. Plaintiffs' Policy is a contract under which Defendants were paid premiums in exchange for its promise to pay Plaintiffs' losses for claims covered by the Policy.

70. The Business Income provisions in the Policies require Defendants to pay for Plaintiffs' actual loss of Business Income sustained due to the necessary suspension of its operations during the period of restoration.

71. Governor Reynolds' Proclamation and/or Covid-19 caused direct physical loss to Plaintiffs' Property resulting in loss of Business Income, thereby triggering the Business Income provision of Plaintiff's Policy.

72. The Policies also provide Civil Authority coverage, which promises to pay the actual loss of Business Income Plaintiff sustained and the necessary Extra Expense cause by action of civil authority that prohibits access to Plaintiff's premises due to physical loss of or damage to the property caused by or resulting from any Covered Cause of Loss.

73. Governor Reynolds' Proclamation prohibited access to Plaintiffs' premises due to physical loss or damage to property resulting in loss of Busines Income and Extra Expense, thereby triggering the Civil Authority provision under Plaintiff's Policy.

74. The Policies also provide that Defendants will pay necessary Extra Expense Plaintiff incurs during the period of restoration that Plaintiff would not have incurred had there been no direct physical loss or damage to the premises.

75. Due to Governor Reynolds' Proclamation, Plaintiffs incurred Extra Expense at Covered Property.

76. At all times material hereto, Plaintiffs maintained reasonable expectations that the loss of business income and additional expenses would be covered under the Policies under the circumstances described herein.

77. The losses described herein are covered losses under the policy.

78. Plaintiffs have complied with the applicable provisions of the Policy.

79. No valid policy exclusion exists to preclude coverage.

80. To the extent the Virus Exclusion would potentially apply, Defendants should be estopped from claiming the virus exclusion excludes coverage under these circumstances.

81. By denying coverage for the claims and losses set forth herein, Defendants have breached its coverage obligations under the Policies.

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment in favor of the Plaintiffs and against the Defendants, including the following relief:

    a.    An award to the Plaintiffs and against the Defendants in an amount in excess of $250,000, plus pre-judgment interest, and;

    b.    Such other and further relief as the Court deems proper, including costs and reasonable attorney fees for having to pursue this matter.

## COUNT III
## CONDUCT OF BAD FAITH

82.    The Plaintiffs re-allege paragraphs 1 through 81 as if fully set forth herein.

83.    Defendants have a contractual obligation to fully and completely investigate a claim of an insured for policies which they have written and for which they have received commissions.

84.    Plaintiffs paid on or about October 1, 2019, an annual premium of $18,185 for business loss of income under policy BP 2767901 01.

85.    Defendants denied coverage for Plaintiffs' claim based on a virus exclusion contained in the policy.

86.    Defendants failed to make any investigation of the claim and did not inquire if any facility that was insured had any evidence of infestation of the coronavirus or any other virus at any time, or if any employee or customer had become infected with the corona virus or other virus at any time.

87.    That there was a complete failure in any manner in good faith to investigate the Plaintiffs' claim and the claim was summarily denied.

88.    That the Defendants have acted in bad faith in denying the Plaintiffs' claim, and failing in good faith to investigate Plaintiffs' claim pursuant to Iowa Administrative Code section 191-15.41 (507A) and Iowa Code section 507A(4)(b).

89.    That as a direct and proximate result of Defendants' bad faith in failing to investigate Plaintiffs' claim, Plaintiffs have been damaged in an amount in excess of $250,000, exclusive of costs and attorney fees.

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment in favor of the Plaintiffs and against the Defendants, including the following relief:

a. An award to the Plaintiffs against the Defendants in an amount in excess of $250,000, plus pre-judgment interest, and;

b. The award of punitive damages as a result of the Defendants acting in bad faith, and for such other relief as the Court deems proper, including costs and reasonable attorney fees.

## JURY DEMAND

The Plaintiffs hereby make a demand for trial by jury on all issues so triable.

Respectfully submitted,

CARNEY & APPLEBY, P.L.C.

*/s/ James W. Carney*

JAMES W. CARNEY (AT0001327)


*/s/ Nicholas J. Mauro*

NICHOLAS J. MAURO (AT0005007)
303 Locust Street, Suite 400
Des Moines IA 50309-1770
Telephone:  515-282-6803
Facsimile:  515-282-4700
E-mail:  carney@carneyappleby.com
E-mail:  mauro@carneyappleby.com
**ATTORNEYS FOR PLAINTIFFS**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon one of the attorneys of record for all parties to the above-entitled cause by serving the same on such attorney at his/her email address as disclosed by the pleadings of record herein and via the courts CM/ECF filing service on September 11, 2020 by:

**Carney & Appleby Law Firm**

CARNEY & APPLEBY LAW FIRM

/s/ Nick Mauro
_____
Nicholas J. Mauro      AT0005007
400 Homestead Building
303 Locust Street
Des Moines, IA 50309
515-282-6803
515-282-4700 (fax)
ATTORNEY FOR PLAINTIFF